GORDON SILVER
BRADLEY J. RICHARDSON
Nevada Bar No. 1159
Email: brichardson@gordonsilver.com
JOEL Z. SCHWARZ
Nevada Bar No. 9181
Email: jschwarz@gordonsilver.com
3960 Howard Hughes Parkway, Ninth Floor
Las Vegas, Nevada 89169-5978
Telephone: (702) 796-5555
Facsimile: (702) 369-2666
Attorneys for Counter-Plaintiff and Third-Party Plaintiff
Rapid Response Marketing, LLC
and Counter-Plaintiff Kevin De Vincenzi

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PMA MEDIA GROUP, INC., a Utah Corporation,<br><br>       Plaintiff,<br><br>v.<br><br>RAPID RESPONSE MARKETING, LLC, a Nevada Limited Liability Company; KEVIN DE VINCENZI, an individual; DOES I through X; and ROE CORPORATIONS XI through XX,<br><br>       Defendants.<br><hr>RAPID RESPONSE MARKETING, LLC, a Nevada limited liability corporation,<br><br>       Counter-Claimant and<br>       Third-Party Plaintiff,<br><br>   and<br><br>KEVIN DE VINCENZI, an individual,<br><br>       Counter-Claimant,<br><br>v. | CASE NO. 2:10-cv-0058<br><br>**1) ANSWER OF DEFENDANTS RAPID RESPONSE MARKETING, LLC AND KEVIN DE VINCENZI TO COMPLAINT;**<br><br>**2) COUNTERCLAIM OF RAPID RESPONSE MARKETING, INC. AND KEVIN DE VINCENZI AGAINST PMA MEDIA GROUP, INC.; AND**<br><br>**3) THIRD-PARTY COMPLAINT BY RRM AGAINST STEPHEN SCANLON, FOR DAMAGES AND INJUNCTIVE AND OTHER RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

1 of 24

1   PMA MEDIA GROUP, INC., a Utah
     corporation,
2
                              Counter-Defendant,
3
4      and
5   STEPHEN SCANLON, an individual,
6                               Third-Party Defendant.
7

8                        **ANSWER TO COMPLAINT**

9           Defendants Rapid Response Marketing, LLC, a Nevada limited liability corporation

10   ("RRM") and Kevin De Vincenzi, an individual ("De Vincenzi"), as and for their joint answer to

11   the Complaint filed herein by Plaintiff PMA Media Group, Inc., a Utah corporation ("PMA"),

12   state and respond as follows:

13                    **PARTIES, JURISDICTION, AND VENUE**

14          1.      Defendants lack knowledge to admit or deny the allegations set forth in paragraph

15   1 of the Complaint, and therefore deny said allegations.

16          2.      Defendants admit the allegations set forth in paragraph 2 of the Complaint.

17          3.      Defendants admit the allegations set forth in paragraph 3 of the Complaint.

18          4.      Defendants deny the allegations set forth in paragraph 4 of the Complaint.

19          5.      Defendants deny that the District Court of Clark County, Nevada, in which this

20   action was originally filed, has or had subject matter jurisdiction over this action, and deny the

21   remaining allegations, express and/or implied, set forth in paragraph 5 of the Complaint.

22          6.      Defendants deny the allegations set forth in paragraph 6 of the Complaint.

23                        **GENERAL ALLEGATIONS**

24          7.      Defendants admit the allegations set forth in paragraph 7 of the Complaint.

25          8.      Defendants deny the allegations set forth in paragraph 8 of the Complaint.

26          9.      Defendants deny the allegations set forth in paragraph 9 of the Complaint.

27          10.     Defendants deny the allegations set forth in paragraph 10 of the Complaint.

28          11.     Defendants deny the allegations set forth in paragraph 11 of the Complaint.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753                                    2 of 24

1       12.     Defendants admit the allegations set forth in paragraph 12 of the Complaint.

2       13.     Defendants admit that PMA and RRM entered into the Master Marketing

3   Agreement attached as Exhibit A to the Complaint on or about the date alleged, but deny the

4   remaining allegations, express and/or implied, set forth in paragraph 13 of the Complaint.

5       14.     Defendants deny the allegations set forth in paragraph 14 of the Complaint.

6       15.     Defendants admit that the Master Marketing Agreement contains the provisions

7   alleged, but deny that those provisions are applicable or pertinent herein, and deny the remaining

8   allegations, express and/or implied, set forth in paragraph 15 of the Complaint.

9       16.     Defendants admit that PMA and RRM entered into the contract attached as

10  Exhibit B to the Complaint on or about the date alleged, but deny the remaining allegations,

11  express and/or implied, set forth in paragraph 16 of the Complaint.

12      17.     Defendants admit that the contract attached as Exhibit B to the Complaint

13  contains the provisions alleged, but deny that those provisions are applicable or pertinent herein,

14  and deny the remaining allegations, express and/or implied, set forth in paragraph 17 of the

15  Complaint.

16      18.     Defendants admit that the contract attached as Exhibit B to the Complaint

17  contains the provisions alleged, but deny that those provisions are applicable or pertinent herein,

18  and deny the remaining allegations, express and/or implied, set forth in paragraph 18 of the

19  Complaint.

20      19.     Defendants lack knowledge to admit or deny the allegations set forth in paragraph

21  19 of the Complaint, and therefore deny said allegations.

22      20.     Defendants lack knowledge to admit or deny the allegations set forth in paragraph

23  20 of the Complaint, and therefore deny said allegations.

24      21.     Defendants deny the allegations set forth in paragraph 21 of the Complaint.

25      22.     Defendants deny the allegations set forth in paragraph 22 of the Complaint.

26      23.     Defendants deny the allegations set forth in paragraph 23 of the Complaint.

27      24.     Defendants deny the allegations set forth in paragraph 24 of the Complaint.

28      25.     Defendants deny the allegations set forth in paragraph 25 of the Complaint.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

3 of 24

26.     Defendants deny the allegations set forth in paragraph 26 of the Complaint.

27.     Defendants deny the allegations set forth in paragraph 27 of the Complaint.

28.     Defendants deny the allegations set forth in paragraph 28 of the Complaint.

29.     Defendants admit that De Vincenzi sent an email to PMA on Saturday, December 19, 2009, but deny the remaining allegations, express and/or implied, set forth in paragraph 29 of the Complaint.

30.     Defendants admit that PMA's counsel sent a letter to Defendants on or about December 23, 2009, but deny the remaining allegations, express and/or implied, set forth in paragraph 30 of the Complaint.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Temporary Restraining Order – Preliminary and Permanent Injunction)**

31.     Defendants restate and incorporate the admissions, denials, and denials for lack of knowledge set forth as to paragraphs 1 through 30 of the Complaint as stated above.

32.     Defendants deny the allegations set forth in paragraph 32 of the Complaint.

33.     Defendants deny the allegations set forth in paragraph 33 of the Complaint.

34.     Defendants deny the allegations set forth in paragraph 34 of the Complaint.

35.     Defendants deny the allegations set forth in paragraph 35 of the Complaint.

36.     Defendants deny the allegations set forth in paragraph 36 of the Complaint.

37.     Defendants deny the allegations set forth in paragraph 37 of the Complaint.

38.     Defendants deny the allegations set forth in paragraph 38 of the Complaint.

39.     Defendants deny the allegations set forth in paragraph 39 of the Complaint.

### SECOND CAUSE OF ACTION
**(Breach of Contract)**

40.     Defendants restate and incorporate the admissions, denials, and denials for lack of knowledge set forth as to paragraphs 1 through 39 of the Complaint as stated above.

41.     Defendants admit that the Master Marketing Agreement and the Contract are valid and enforceable contracts in at least one context, but deny that those contracts are

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

4 of 24

1  necessarily pertinent to PMA's claims herein against RRM and De Vincenzi, and deny the

2  remaining allegations, express and/or implied, set forth in paragraph 41 of the Complaint.

3      42.    Defendants deny the allegations set forth in paragraph 42 of the Complaint.

4      43.    Defendants deny the allegations set forth in paragraph 43 of the Complaint.

5      44.    Defendants deny the allegations set forth in paragraph 44 of the Complaint.

6      45.    Defendants deny the allegations set forth in paragraph 45 of the Complaint.

7      46.    Defendants deny the allegations set forth in paragraph 46 of the Complaint.

**THIRD CAUSE OF ACTION**
**(Breach of Covenant of Good Faith and Fair Dealing)**

    47.    Defendants restate and incorporate the admissions, denials, and denials for lack of knowledge set forth as to paragraphs 1 through 46 of the Complaint as stated above.

    48.    Defendants admit that the Master Marketing Agreement and the Contract are valid and enforceable contracts in at least one context, but deny that those contracts are necessarily pertinent to PMA's claims herein against RRM and De Vincenzi, and deny the remaining allegations, express and/or implied, set forth in paragraph 48 of the Complaint.

    49.    Defendants deny the allegations set forth in paragraph 49 of the Complaint.

    50.    Defendants deny the allegations set forth in paragraph 50 of the Complaint.

    51.    Defendants deny the allegations set forth in paragraph 51 of the Complaint.

    52.    Defendants deny the allegations set forth in paragraph 52 of the Complaint.

    53.    Defendants deny the allegations set forth in paragraph 53 of the Complaint.

    54.    Defendants deny the allegations set forth in paragraph 54 of the Complaint.

    55.    Defendants deny the allegations set forth in paragraph 55 of the Complaint.

    56.    Defendants deny the allegations set forth in paragraph 56 of the Complaint.

    57.    Defendants deny the allegations set forth in paragraph 57 of the Complaint.

**FOURTH CAUSE OF ACTION**
**(Misappropriation of Trade Secrets)**

    58.    Defendants restate and incorporate the admissions, denials, and denials for lack of knowledge set forth as to paragraphs 1 through 57 of the Complaint as stated above.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

59.     Defendants deny the allegations set forth in paragraph 59 of the Complaint.

60.     Defendants deny the allegations set forth in paragraph 60 of the Complaint.

61.     Defendants deny the allegations set forth in paragraph 61 of the Complaint.

62.     Defendants deny the allegations set forth in paragraph 62 of the Complaint.

63.     Defendants deny the allegations set forth in paragraph 63 of the Complaint.

64.     Defendants deny the allegations set forth in paragraph 64 of the Complaint.

65.     Defendants deny the allegations set forth in paragraph 65 of the Complaint.

66.     Defendants deny the allegations set forth in paragraph 66 of the Complaint.

67.     Defendants deny the allegations set forth in paragraph 67 of the Complaint.

68.     Defendants deny the allegations set forth in paragraph 68 of the Complaint.

69.     Defendants deny each and every express and/or implied allegation set forth in the Complaint which is not specifically admitted herein.

## AFFIRMATIVE DEFENSES

1.     The Complaint and each cause of action therein fail to state a claim upon which relief may be granted.

2.     The Complaint and each cause of action therein are barred by PMA's failure to mitigate its damages and/or other harms alleged, which are expressly denied.

3.     The acts and omissions alleged in the Complaint, as well as the damages and harms alleged therein, which are expressly denied, were caused and/or contributed to by the acts and omissions of third parties over which Defendants had no control nor any duty to control.

4.     The acts and omissions alleged in the Complaint, as well as the damages and harms alleged therein, which are expressly denied, were caused and/or contributed to by the acts and omissions of PMA.

5.     The Complaint and each cause of action therein are barred by the doctrines of waiver, estoppels, laches, and/or unclean hands.

6.     The Complaint and each cause of action therein are barred by the doctrines of complete, partial, express, and/or implicit preemption under federal law, including without

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753                                6 of 24

1 limitation the Copyright Act, 17 U.S.C. §§ 101 et seq.; the Lanham Act, 15 U.S.C. §§ 1051 et

2 seq.; and/or other provisions of federal law.

3        7.     The damages and harms alleged in the Complaint, which are expressly denied, are

4 barred in whole or in part by principles of setoff and/or counterclaim.

5        8.     Defendants are excused from liability by reason of PMA's own breach of the

6 contract or contracts at issue, if any, and that by reason of said breach of contract, Defendants

7 have been excused of their duties to perform all obligations set forth in said contract or contracts,

8 if any.

9        9.     The Complaint and each cause of action therein are barred by reason of PMA's

10 material breach of the contract or contracts alleged, if any; PMA's failure to comply with the

11 terms of the contract or contracts alleged, if any; and PMA's failure to fulfill all conditions

12 precedent to enforcing the same.

13      10.     The damages and harms alleged in the Complaint and each cause of action

14 therein, which are expressly denied, were proximately caused by PMA and/or others affiliated in

15 any manner with PMA, in that at all times relevant herein, the same failed to exercise for their

16 own protection the proper care and precautions which prudent persons under the same and

17 similar circumstances would have exercised; and that if Defendants committed any wrongful act

18 at all, which is expressly denied, the aforesaid conduct of PMA and/or entities or persons

19 associated in any manner with PMA caused and/or contributed to the damages and/or harms

20 alleged.

21      11.     The Complaint and each cause of action therein are barred by reason of failure of

22 consideration.

23      12.     The Complaint and each cause of action therein are barred by reason of the

24 novation, modification, and/or rescission of the contract or contracts alleged.

25      13.     The Complaint and each cause of action therein are barred by reason of the

26 mutual mistake of the parties as to matters of fact and/or law.

27      14.     The Complaint and each cause of action therein are barred by reason of the

28 impossibility, impracticability or frustration of the purpose of the contract or contracts alleged, if

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

7 of 24

1   any.

2       15.     None of the information, processes, procedures, or other matters alleged in the

3   Complaint or in any cause of action therein constitutes a legally protectable trade secret.

4       16.     With respect to each and every allegation of fact or law in the Complaint or in any

5   cause of action therein in which PMA contends, either expressly or by implication, that any of its

6   alleged trade secrets are the subject of protection under copyright, patent, or trademark law, said

7   allegations and claims are barred by the doctrine of fair use.

8       17.     With respect to each and every allegation of fact or law in the Complaint or in any

9   cause of action therein in which PMA contends, either expressly or by implication, that any of its

10  alleged trade secrets are the subject of protection under copyright, patent, or trademark law, said

11  allegations and claims are barred by PMA's license or other authorization to Defendants for the

12  use and/or disclosure of the alleged trade secrets, if any.

13      18.     PMA has failed to establish personal jurisdiction over Defendants by reason of

14  insufficiency of process and/or service of process.

15      19.     The allegedly infringing, misappropriating, and/or otherwise wrongful statements

16  and conduct of Defendants, which is expressly denied, were privileged to have been made by

17  Defendants as a matter of law and/or under the circumstances.

18      20.     PMA has not alleged a sufficient basis for extraordinary, preliminary, or any other

19  kind of equitable relief.

20      21.     Defendants reserve all available defenses which may be applicable herein,

21  pending further investigation and discovery.

22      WHEREFORE, having fully answered, Defendants Rapid Response Marketing, LLC and

23  Kevin De Vincenzi demand that judgment be rendered in their favor and against Plaintiff PMA

24  Media Group, Inc. in all respects; that the Complaint be dismissed with prejudice and at PMA's

25  costs; that Defendants be awarded the costs of suit and reasonable attorneys' fees incurred in

26  defending the within action; and that Defendants be permitted to go forth without day.

27  ...

28  ...

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

8 of 24

## COUNTERCLAIM and THIRD-PARTY COMPLAINT

Counter-Plaintiff and Third-Party Plaintiff Rapid Response Marketing, LLC, a Nevada limited liability corporation ("RRM"), and Counter-Plaintiff Kevin De Vincenzi ("De Vincenzi"), as and for their counterclaim against Plaintiff and Cross-Defendant PMA Media Group, Inc., a Utah corporation ("PMA") and RRM's third-party complaint against Third-Party Defendant Stephen Scanlon, an individual ("Scanlon"), state and allege as follows:

### INTRODUCTION AND PARTIES

1.      This Counterclaim and Third-Party Complaint arises out of the breach of a contract between RRM and PMA for the placement by RRM of advertisements for PMA on websites (including social media websites) and online advertising networks, the subsequent infringement by PMA of RRM's intellectual property rights in those advertisements and elements thereof, and PMA's other unfair, unjust and unlawful business practices.  RRM is entitled to damages for PMA's wrongful acts and omissions, and is also entitled to equitable and other relief to prevent further acts of infringement by PMA and to remove infringing material from the Internet.  RRM and De Vincenzi are entitled to declaratory and other relief as well, as alleged further and demanded herein.

2.      Counter-Plaintiff and Third-Party Plaintiff Rapid Response Marketing, LLC ("RRM") is a limited liability corporation duly formed and existing under the laws of the State of Nevada and maintains its principal place of business in Las Vegas, Nevada.  At all times pertinent, RRM did and does business under the names "Rapid Response Marketing" and "xy7.com" and is and was engaged generally in the business of placing advertisements, ad banners, hyperlinks, and other forms of advertising on its network of publishers', advertisers' and affiliates' websites.  Counter-Plaintiff Kevin De Vincenzi ("De Vincenzi") is the president of RRM.

3.      Counter-Defendant PMA Media Group, Inc. ("PMA") is a corporation duly formed and existing under the laws of the State of Utah and maintains its principal place of business in Provo, Utah.  At all times pertinent, PMA is and was engaged generally in the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

business of maintaining online advertising campaigns.

4. Third-Party Defendant Stephen Scanlon ("S. Scanlon") is an individual who upon knowledge and belief is a citizen of the State of Utah, and who at times pertinent was acting on behalf of, and in his capacity as the executive vice president or other officer, principal, or other representative of, PMA.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action under title 28, section 1338(a) of the United States Code, as some or all of the claims alleged herein arise under acts of Congress relating to copyrights. This Court also has jurisdiction over the subject matter of this action under title 15, section 1121(a), as some or all of the claims alleged herein arise out of the Lanham Act, 15 U.S.C. §1051 et seq. This Court also has jurisdiction over the subject matter of this action under title 28, section 1332 of the United States Code, as the amount in controversy exceeds the sum or value of $75,000 and all the claims herein are between "citizens" of different states. This Court also has jurisdiction over the subject matter of this action under title 28, section 1331 of the United States Code, as one, some, or all of the claims herein arise under the laws of the United States. This Court also has supplemental jurisdiction under title 28, section 1367 over the state-law claims alleged herein.

6. Venue is appropriate in this District under title 28, section 1391(b)(2) of the United States Code because a substantial part of the events and omissions giving rise to this action occurred in this district. Venue is also appropriate in this district under title 28, section 1400(a) because some or all of the claims alleged herein arise under acts of Congress relating to copyrights, and one, some, or all defendants or their agents may be found in this district. Venue is appropriate in the Southern division of this Court because plaintiff maintains its principal place of business in Las Vegas, Nevada, within the geographic bounds of the Southern division. See LR IA 6-1(a), LR IA 8-1(a). Venue in this district and division is also appropriate under the terms of an agreement which governs the relations between the parties and the disputes in this action.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

## FACTS

**RRM**

7.     Rapid Response Marketing and its founders are pioneers in the online advertising business.  Since its founding in 2000, RRM has grown into one of the Internet's largest affiliate networks.  An "affiliate network" connects sellers of goods and services, colloquially known as "advertisers," with "affiliates" who publish email, banner advertisements, websites, and other forms of Internet media.  In essence, an affiliate network acts as a media buyer and broker that helps advertisers place ads in those online media most likely to reach the advertiser's target demographic.

8.     RRM has an exceptional reputation in the online advertising industry among both advertisers and affiliates.  As a result of that reputation, RRM has grown to become the Internet's fourth largest affiliate network.

9.     RRM has long been among the number of affiliate networks which place advertising on "social media" websites such as Facebook.com and MySpace.com.  RRM has placed advertisements on social media websites for advertisers in industries as diverse as education, financial services, travel, dating, small business needs, insurance, and other fields.

**RRM's Extensive Experience in the Online Advertising of Extended Education Programs, Including in Law Enforcement (aka, "Criminal Justice")**

10.     Starting in the summer of 2008, RRM initiated a social media advertising campaign on behalf of an advertiser of extended education programs in vocational areas such as law enforcement, or "criminal justice."  RRM's role in that campaign extended beyond that of an affiliate network, in that RRM essentially managed certain of the advertiser's campaigns, including one campaign relating specifically to education programs in the field of criminal justice.  In that role, RRM created, tested and oversaw the placement on websites, including social media websites, of "banner" and other advertisements for the criminal justice education programs advertised by that advertiser.  RRM also created and tested the Internet "landing pages" by means of which the advertiser gathered its criminal justice "sales leads."  (A "landing

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1    page" is an Internet page containing a form permitting a visitor to enter personal and contact

2    information, for the purpose of being contacted by the advertiser.   The user's personal

3    information, as provided to the advertiser, is referred to as a "sales lead.")   RRM also managed

4    the "back office" functions relating to the advertiser's criminal justice education campaign.

5          11.    During the course of its work on behalf of that advertiser, RRM developed

6    significant expertise in the design of education-related Internet advertisements, as well as in the

7    overall management of education – and in particular criminal justice education – advertising

8    campaigns.

9    **PMA Contracts with RRM Because of RRM's Expertise in the Online Advertising of**

10   **Criminal Justice Education Programs**

11         12.    In the third quarter of 2009, RRM CEO Kevin De Vincenzi and Vice President of

12   Network Operation Ken Graham met with PMA's principals, including Christopher Scanlon and

13   Stephen Scanlon, to discuss how RRM might be able to increase its business with PMA.   During

14   that meeting, De Vincenzi and Graham described RRM's ability, proven by its success with the

15   other advertiser and the campaigns RRM managed for the other advertiser on social media

16   websites, to generate sales leads for education programs, including criminal

17   justice education programs.   De Vincenzi and Graham further described how RRM could provide

18   this experience to benefit PMA, which did not have the same level of experience and know-how

19   in regards to the advertisement of education programs on social media websites.

20         13.    As a result of that meeting, PMA agreed to engage RRM on an exclusive basis to

21   place PMA's advertising for criminal justice and other education programs on social media

22   websites.   That campaign proved successful, in that the volume of sales leads generated by

23   advertisements placed by RRM on behalf of PMA quickly grew, and the quality of the leads

24   generated as a result of those advertisements was consistently excellent.   Initially, PMA offered

25   to pay RRM to place advertisements sufficient to generate 300 sales leads a day.   PMA soon

26   increased the number of sales leads in relation to which it agreed to pay RRM to 2,000 per day.

27   ...

28   ...

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

**RRM and PMA's Master Advertising Agreement**

14.     Prior to the parties' September 2009 meeting, and on or about June 26, 2008, RRM and PMA entered into a contract (the "Master Advertising Agreement," or "Agreement," attached as **Exhibit A**) containing terms governing all placements by RRM on RRM's publishing network of advertisements on behalf of PMA.

15.     The Agreement contains several provisions of significance in this action.

(a)   First, the Agreement contains a "Payment Terms" provision stating, among other things, that "[PMA] shall be liable to RRM for all attorneys' fees and other costs of collection to collect such unpaid amounts."

(b)   Second, the Agreement contains an "Exclusivity" provision giving RRM the "exclusive rights to market [PMA's] products online," with a right of first refusal, until such time as PMA notifies RRM that PMA is terminating the exclusivity provision upon 30 days' notice. That provision has yet to be terminated.

(c)   Third, the Agreement contains a "Non-Solicitation with RRM Affiliates" provision prohibiting PMA from "participat[ing] in any performance based advertising relationship with any RRM Affiliate [publisher] that markets the product hereunder, unless a previously existing business relationship between [PMA] and Affiliate can be demonstrated ..."

(d)   Fourth, the Agreement contains a "Delivery Measurement Standards" provision permitting RRM to "have access to live reporting of campaign statistics such as impressions, clicks, units, etc. via the Internet through Advertiser's Tracking Center." [1]

(e)   Fifth, the Agreement contains a "Creative Guidelines" provision stating that "[i]f RRM creates creatives, copy or any other material used for solicitation purposes, then it belongs to RRM.   Advertiser shall have no rights to ownership of any such creative; nor shall they disburse, duplicate or distribute it to any affiliate, publisher, network or any other third party."

---

[1]  The amounts payable by PMA to RRM are calculated on the basis of how many leads were generated from advertisements placed by RRM.   Accordingly, RRM's access to these statistics, as required by the "Delivery Measurement Standards" provision, was of crucial importance to RRM's ability to calculate the fees due from PMA and to invoice PMA appropriately.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

**PMA's Multiple Breaches of the Agreement**

16. In or about November 2009 or early December 2009, RRM received information that PMA had spoken with one or more RRM affiliates regarding the possibility of those affiliates working directly with PMA to publish criminal justice education advertisements on behalf of PMA. Soon thereafter, PMA began reducing the number of sales leads for which it would compensate RRM, and lowered the price it was willing to pay RRM for leads. On information and belief, PMA then contracted, or attempted to contract, directly with one or more of RRM's affiliates to publish advertisements sufficient to generate the balance of PMA's daily demand for criminal justice education sales leads, in direct violation of the Agreement's Exclusivity and Non-Solicitation provisions. In many or most cases, PMA was aware that the RRM affiliates it was entering, or attempting to enter, into contracts with were, in fact, RRM affiliates. On information and belief, in at least one case, PMA asked for an affiliate's RRM "affiliate ID number" so that PMA could evaluate that affiliate's past performance on RRM's criminal justice education and related campaigns by means of RRM's own information systems.

17. On or about December 16, 2009, PMA informed RRM that it would no longer compensate RRM for sales leads generated as a result of criminal justice education advertisements published by RRM's affiliates. Several days later, PMA contacted RRM and offered to revive the campaign, provided that RRM agreed to lower the amount paid by PMA for each sales lead generated.

18. On December 19, 2009, De Vincenzi, aware of PMA's ongoing violations of the Agreement, responded that RRM would agree to a partial price decrease, although on the condition that PMA adjust other terms of the campaign, in particular by removing the ever-declining cap on the number of sales leads and by routing all contacts from sales leads to RRM.. De Vincenzi added that if PMA was unwilling to agree to RRM's counteroffer, RRM would "pass altogether on a budget and will be taking a criminal justice deal from 2 other vendors." Within days of De Vincenzi's counteroffer, PMA began threatening to institute baseless and frivolous litigation.

…

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

19.     On or about December 7, 2009, PMA was due to make a payment under the Agreement in the amount of $253,312.00. The payment represented compensation to RRM for sales leads already received by PMA. PMA failed to make that payment in a timely fashion, in direct violation of the Agreement's Payment Terms provision.[2]

20.     On or about January 6, 2010, RRM learned that PMA had locked RRM out of the online "tracking system" by means of which RRM was able to calculate the amounts payable by PMA to RRM, in direct violation of the Agreement's Delivery Measurement Standards provision. In response to a request by RRM for information sufficient to permit calculation of all amounts owed, PMA President Chris Scanlon stated that PMA "would not grant any access to RRM until [its affirmative claims] had been resolved." Also in his January 6 response, C. Scanlon admitted that PMA was withholding amounts due to RRM under the Agreement, stating "PMA will be putting all payments on hold until adequate relief can be made to PMA …"

21.     In or about early January 2010, RRM received additional information that PMA had contracted with other of RRM's affiliates to publish criminal justice education advertisements on behalf of PMA, again in direct violation of the Agreement's Exclusivity and Non-Solicitation provisions.

22.     Around the same time, on information and belief, PMA Executive Vice President Stephen Scanlon, and perhaps others acting on behalf of PMA, began making false statements to RRM's affiliates concerning RRM. Those false statements included, without limitation, that RRM had violated its agreement with PMA; that RRM had committed other wrongful, dishonorable or deceitful acts; that RRM was likely to cease doing business in relation to the advertisement of education programs, or at least criminal justice education programs; and that PMA intended to, and would, institute baseless and frivolous litigation against RRM to bar RRM

---

[2] PMA did make a payment of $253,312.00 to RRM on January 16, 2010. However, PMA did so only after RRM and De Vincenzi had removed this action to federal court, and only then with a clearly-stated reservation that PMA was paying under protest. Moreover, since PMA had still locked RRM out of the campaign statistics tracking system – and is still barring RRM from accessing that system – RRM had and has no way to verify the amount PMA owes to RRM, and has no way to generate accurate invoices for PMA. Accordingly, RRM's acceptance of this payment was with the caveat that the payment was being accepted as a setoff of amounts due to RRM from PMA, subject to revision upon the determination of the correct amount to be invoiced, and not as a compromise or other resolution of the dispute over payment.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

1    from further competing to publish online advertisements for education programs.

2        23.    On information and belief, S. Scanlon and others made those statements with the

3    specific intent of damaging RRM's reputation and goodwill.  Those statements were made in

4    connection with a concerted effort by PMA and others to disrupt RRM's business relationships

5    with its affiliates, and to prevent RRM from further competing to publish online advertisements

6    for education programs.  All those statements were false, and were made by S. Scanlon and

7    others with knowledge of their falsehood.

8        24.    On or about January 7, 2010, counsel for RRM contacted counsel for PMA to

9    inform PMA of PMA's violations of the Agreement's Exclusivity and Non-Solicitation

10   provisions, and of Scanlon's and others' false and misleading statements about RRM.  On or

11   about January 11, 2010, S. Scanlon, and perhaps others acting on PMA's behalf, began

12   contacting some or all of the RRM affiliates then under contract with PMA to inform them that

13   PMA would not be able to work with RRM's affiliates for three months, as a direct result of

14   PMA's contractual obligations to RRM.

15       25.    In mid-January 2010, RRM discovered that PMA had misappropriated certain

16   RRM creatives, copy and/or other materials created by RRM, including by providing such

17   materials to PMA's affiliates for republication, in direct violation of the Agreement's Creative

18   Guidelines provision.  As the author and creator of those materials, RRM is the holder of the

19   exclusive copyright and other rights therein, and is entitled to enforce its copyright and other

20   rights and to prevent the infringement thereof.  Currently, RRM is gathering information

21   sufficient to permit the filing of amended counterclaims stating a separate cause of action for

22   violation of the U.S. Copyright Act.

23       26.    As pled more fully below, PMA and S. Scanlon acted wrongfully and tortiously in

24   refusing to timely pay the amounts due to RRM under the Master Advertising Agreement, in

25   violating the terms of the exclusivity provision therein, in misusing and misappropriating RRM's

26   creatives and other copyrighted and protected material, in failing and refusing to provide RRM

27   with access to campaign statistics, and in interfering with RRM's relations with its affiliates.

28   Accordingly, RRM is entitled to recover contractual and tort-related damages from PMA.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

Furthermore, RRM is entitled to injunctive relief against PMA to remedy past acts of infringement against RRM's copyright and other rights in the creatives, copy and/or other materials misappropriated by PMA, and to prevent ongoing and future acts of infringement by PMA.

**FIRST CAUSE OF ACTION**
**(Breach of Contract Against PMA Only)**

27.    RRM restates and incorporates the allegations set forth in paragraphs 1 through 26 as though fully rewritten herein.

28.    The Master Advertising Agreement between RRM and PMA is a written contract supported by good and valuable consideration and is enforceable by RRM against PMA.

29.    PMA has breached its contract with RRM in a number of manners, including without limitation PMA's failure and/or refusal to timely pay the full amounts due to RRM thereunder, PMA's failure to provide RRM with access to campaign statistics, PMA's subversion of the exclusivity provision by reason of PMA's contacts with RRM's affiliates, PMA's solicitation of RRM's affiliates, and PMA's misuse of RRM's creatives and resulting infringement of RRM's copyrights therein.

30.    As a direct and proximate result of PMA's conduct as alleged herein, RRM is entitled to recover damages from PMA in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Intentional Interference with Contractual Relations**
**Against PMA and S. Scanlon)**

31.    RRM restates and incorporates paragraphs 1 through 30 above as though fully rewritten herein.

32.    At all times pertinent, RRM had valid and enforceable contracts with its affiliates whereby those affiliates would accept advertising from RRM for RRM's clients, including PMA, through RRM.

33.    PMA and S. Scanlon knew at all times pertinent that RRM had valid and enforceable contracts with RRM's affiliates as alleged herein.

34.    PMA and S. Scanlon committed the acts and conduct set forth above, including

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753                                    17 of 24

without limitation the contacts with and solicitations of RRM's affiliates, with the intent to induce a breach or disruption of the above contractual relations.

35.     As a direct and proximate result of PMA's and S. Scanlon's unlawful and tortious acts and conduct as set forth above, there was an actual breach and/or disruption of RRM's contractual relations with RRM's affiliates.

36.     As a direct and proximate result of PMA's and S. Scanlon's acts and conduct set forth above, RRM has suffered damages in an amount to be determined at trial.

37.     PMA's and S. Scanlon's intentional interference with RRM's contractual relations as set forth above was done with oppression, fraud, or malice, express or implied, as defined in N.R.S. 42.001, and thereby entitles RRM to recover, in addition to compensatory damages, additional damages for the sake of example and by way of punishing PMA and S. Scanlon.

### THIRD CAUSE OF ACTION
**(Intentional Interference with Prospective Economic Advantage**
**Against PMA and S. Scanlon)**

38.     RRM restates and incorporates paragraphs 1 through 36 above as though fully rewritten herein.

39.     At all times pertinent, RRM has and had a reasonable expectation of continuing and prospective economic relations with its affiliates.  RRM's expectation in that regard was reasonable because, among other things, RRM has had longstanding and ongoing contracts for the placement of advertising with those affiliates, has fulfilled those contracts to the mutual satisfaction of RRM and the affiliates, and had not been given any indication, until PMA's and S. Scanlon's interference occurred, that RRM's relations with those affiliates would not continue as before.

40.     PMA and S. Scanlon interfered with RRM's prospective economic relations with RRM's affiliates through the above-referenced acts and conduct that were, of themselves, independently unlawful or otherwise wrongful apart from the fact of the interference itself. PMA's and S. Scanlon's conduct in this regard was independently wrongful because it consisted of PMA's and S. Scanlon's use of their illegally gained knowledge and misuse of RRM's

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

18 of 24

creative, RRM's pricing structure and agreement with those affiliates, and other proprietary information of RRM, in order to interfere with RRM's relations with its affiliates; because PMA and S. Scanlon knew that RRM had the exclusive right to deal directly with those affiliates but solicited business directly with those affiliates nonetheless; and because the economic relations with which PMA and S. Scanlon interfered drew much of their value from the fact that RRM was the only party entitled to deal directly with those affiliates.   PMA's and S. Scanlon's independently wrongful acts and conduct induced RRM's affiliates to breach their contracts with RRM, and/or otherwise thwarted, frustrated, impeded, and otherwise disrupted their relationships with RRM.

41.   PMA's and S. Scanlon's tortious and illegal acts and conduct set forth above were committed with the intent to thwart, frustrate, and impede RRM's prospective economic relations with its affiliates, or with the knowledge that such interference with those relations was certain or substantially certain to occur as a result of PMA's and S. Scanlon's acts and conduct.

42.   As a direct and proximate result of PMA's and S. Scanlon's intentional interference with RRM's prospective economic relations as set forth above, RRM has lost revenues from its affiliates, which revenue was reasonably expected to be received by RRM and has thereby sustained damages in an amount to be determined at trial.

43.   PMA's and S. Scanlon's intentional interference with RRM's prospective economic relations as set forth above was done with oppression, fraud, or malice, express or implied, as defined in N.R.S. 42.001, and thereby entitles RRM to recover, in addition to compensatory damages, additional damages for the sake of example and by way of punishing PMA and S. Scanlon.

**FOURTH CAUSE OF ACTION**
**(Trade Libel Against PMA Only)**

44.   RRM restates and incorporates the allegations set forth in paragraphs 1 through 43 above as though fully rewritten herein.

45.   The statements and representations made by PMA of and concerning RRM to PMA's affiliates included, but were not limited to, advertising, publishing, disseminating and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

1   communicating false and misleading statements and unfounded misrepresentations about the

2   business, goodwill, and reputation of RRM, including but not limited to false statements that

3   RRM was experiencing financial and operational difficulties, was about to go out of business,

4   and was otherwise unable to continue providing services to those affiliates.

5       46.    The aforementioned false statements and representations of and concerning RRM

6   were published, disseminated, or otherwise communicated by PMA.

7       47.    The aforementioned false statements and representations made by PMA of and

8   concerning RRM were published, disseminated, or otherwise communicated by PMA across

9   state borders and in interstate commerce.

10      48.    The aforementioned false statements and representations made by PMA of and

11  concerning RRM were statements and representations of a commercial nature and constituted

12  commercial speech since they were published, disseminated, or otherwise communicated with

13  the intent of increasing PMA's sales and/or decreasing RRM's sales.

14      49.    As a direct and proximate result of PMA's conduct as alleged herein, RRM is

15  entitled to recover damages from PMA in an amount to be determined at trial.

16                      **FIFTH CAUSE OF ACTION**
                **(Breach of Covenant of Good Faith and Fair Dealing Against PMA Only)**
17

18      50.    RRM restates and incorporates the allegations set forth in paragraphs 1 through 49

19  as though fully rewritten herein.

20      51.    The Master Advertising Agreement between RRM and PMA constituted a

21  contract and contained a covenant that PMA would act in good faith and would deal fairly with

22  RRM in all respects in connection with the formation and performance of the contract.  Part of

23  that covenant of good faith and fair dealing included implicit or express obligations on the part of

24  PMA to, among other things, pay the amounts due to RRM in a timely fashion; continue to

25  provide RRM with access to the campaign statistics tracking system as required by the contract,

26  so RRM could properly invoice PMA for the amounts due from PMA; and in other respects that

27  may become known during the pendency of this action.

28  ...

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

20 of 24

52.     PMA breached the covenant of good faith and fair dealing in the contract with RRM by, among other things, failing to pay the amounts due to RRM in a timely fashion, and preventing RRM from accessing campaign statistics and thus preventing RRM from being able to calculate the amounts due from PMA and to properly invoice PMA for those amounts.

53.     As a direct and proximate result of PMA's conduct as alleged herein, RRM is entitled to recover damages from PMA in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**(For An Accounting Against PMA Only)**

54.     RRM restates and incorporates the allegations set forth in paragraphs 1 through 53 as though fully rewritten herein.

55.     The amounts alleged to be due and owing between RRM on the one hand and PMA on the other are sufficiently complicated, and the facts demonstrating such amounts are sufficiently complicated, that the determination of such amounts cannot be had through ordinary calculation or with reference to a sum certain.

56.     RRM is entitled to an order requiring PMA to provide an accounting of all amounts chargeable by, and owing to, RRM by PMA with respect to the matters and dealings which are the subject of this action, as alleged above, so a complete and accurate reckoning of the same may be had.

**SEVENTH CAUSE OF ACTION**
**(Declaratory Judgment Against PMA Only)**

57.     RRM and De Vincenzi restate and incorporate the allegations set forth in paragraphs 1 through 56 as though fully rewritten herein.

58.     An actual controversy has arisen and exists between RRM and De Vincenzi on the one hand and PMA on the other about their respective rights and duties. RRM and De Vincenzi contend, among other things, that they did not infringe upon any copyright or other rights of PMA in any creatives or other works, and that the interests alleged by PMA to have been infringed upon by RRM and/or De Vincenzi were not protected by copyright or other rights and/or were not infringed upon by RRM and/or De Vincenzi.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

59.   The respective interests of the parties will be materially affected by this action.

60.   RRM and De Vincenzi desire, and are entitled to, a judicial determination under title 28, section 2201 et seq. of the United States Code of the parties' respective rights and duties, as well as a declaration to those effects.

## PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiff and Third-Party Plaintiff Rapid Response Marketing, LLC and Counter-Plaintiff Kevin De Vincenzi respectfully demand that judgment be rendered in their favor and against Counter-Defendant PMA Media Group, Inc. and Third-Party Defendant Stephen Scanlon as follows:

1.   For damages of a compensatory and general nature, in an amount according to proof as alleged and demanded above;

2.   For a preliminary injunction and permanent injunction requiring PMA and its partners, agents, employees, assignees, trustees, and all persons acting in concert or participating with PMA, to refrain from committing further acts of the nature alleged herein, including any act or acts of infringement against RRM's copyrights, and to refrain generally from taking any action in derogation of the Court's jurisdiction over the subject matter of this action;

3.   For punitive damages in an amount sufficient to make an example of PMA and S. Scanlon and to deter others from similar conduct by way of example, according to proof as alleged and demanded above;

4.   For an order requiring PMA to provide an accounting of all sums chargeable by, and owing to, RRM as alleged herein;

5.   For a judgment declaring the rights and obligations of the parties in the respects alleged herein;

6.   For costs of suit, including reasonable attorney's fees; and

...

...

...

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

7.     For all other relief as the Court deems just.

DATED this _19th_ day of January, 2010.

GORDON SILVER

_Bradley J. Richardson_

BRADLEY J. RICHARDSON
Nevada Bar No. 1159
JOEL Z. SCHWARZ
Nevada Bar No. 9181
3960 Howard Hughes Parkway, Ninth Floor
Las Vegas, Nevada 89169-5978
(702) 796-5555
Attorneys for Counter-Plaintiff and Third-Party
Plaintiff Rapid Response Marketing, LLC
and Counter-Plaintiff Kevin De Vincenzi

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

**CERTIFICATE OF SERVICE**

The undersigned, an employee of Gordon Silver, hereby certifies that on the 19th day of January, 2010, she served a copy of the foregoing Answer to Complaint, Counterclaim, and Third-Party Complaint to all interested parties, by filing through the Court's CM-ECF system.

In addition, a copy of the Notice, was placed in an envelope, postage fully prepaid, in the U.S. Mail at Las Vegas, Nevada, said envelope addressed to:

Stanley W. Parry, Esq.
Jacob D. Bundick, Esq.
Ballard Spahr, LLP
100 N. City Parkway, Suite 1750
Las Vegas, NV 89106

Anna Dang, an employee of
GORDON SILVER

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101966-002/829753

24 of 24

# EXHIBIT A

801  705  4900    P.01

DEC-21-2009  13:23    PMA Media Group
*(handwritten)*



A Division of Rapid Response Marketing, L.L.C.

# Master Advertising Agreement

**Date:  06/26/2008**

**Make Checks Payable to:**
RAPID RESPONSE MARKETING, L.L.C.
7500 WEST LAKE MEAD BLVD STE 9-463
LAS VEGAS, NV  89128
PHONE: (866) XY7-PAYS
FAX: (714) 464-5425

**ACCOUNT INFORMATION**
Client/Advertiser Name: PMA Media Group, Inc.
Contact Name: Steve Scanlon
Primary Contact Email: stephens@pmamediagroup.com

Client Name: PMA Media Group, Inc.
Contact Phone: 801-705-4400
Emergency Contact: 801-623-1708
Primary Contact Phone: 801-705-4910

**BILLING AND PAYMENT INFORMATION**
Billing Address: 5255 N. Edgewood Drive, Suite, 225, Provo, UT 84604
Billing Contact Name: Judy Benoit
Billing Contact Email: accounting@pmamediagroup.com
Billing Phone: 801-705-4909
Fax: 801-705-4900

**XY7.com**
A Division of Rapid Response Marketing, L.L.C
**MASTER ADVERTISING AGREEMENT**

This Master Advertising Agreement (Agreement) is made on this 26th day of June, 2008, by and between Rapid Response Marketing, LLC, (hereinafter referred to as 'RRM'), and PMA Media Group, Inc., (hereinafter referred to as 'Advertiser').

**WHEREAS** RRM is in the business of placing advertisements, ad banners, hyperlinks, text content, buttons and/or other forms of advertisement on its network of publishers', advertisers' and affiliates' web sites; and,

**WHEREAS** Advertiser wishes to place one or more advertisements on and within RRM's Network; and,

**WHEREAS** Advertiser wishes to engage RRM to place advertisements on RRM's Network; and,

**WHEREAS** Advertiser and RRM will have agreed to the terms of the Insertion Order Agreement (IO) which is incorporated herein by reference,

**NOW THEREFORE**, in consideration of the foregoing and of the mutual premises and covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1 Of 7

Advertiser Initials: _____                                    RRM Initials: _____

**Authority to Execute Agreement**
Each Party warrants that it has full power and authority to enter into this Agreement; and that the execution, delivery and performance by each Party of this Agreement will not violate any law, statute or other governmental regulations. Both Parties mutually warrant that the signing of this Agreement in no way violates any other agreement that either Party may have with other entities.

**Notices**
All notices to be given under this Agreement shall be either by e-mail, personal delivery, overnight mail or certified mail to the addresses of the Parties as referenced on the first page hereof. If either Party should change its address, then said party is hereby required to provide written notice of such address change to the other party as prescribed herein within ten (10) days of such address change.

**Return and Refund Policy**
No refunds will be made and all sales are final once payment is submitted. All actions are considered valid and payable once a pixel is fired. No returns will be accepted. RRM reserves the right to retain any setup fees paid by the Advertiser.

**Cancellation Policy**
A written notice is required three (3) business days in advance to stop traffic. All additional generation that come in after the media has been stopped, ('Spill'), must be paid for. Should there be an exclusive term within this Master Advertising Agreement, it will survive until its expiration and cannot be canceled.

**Renewal**
The Term of this Agreement shall automatically renew every month unless terminated earlier, by either Party, in accordance with this Agreement.

**Payment Terms**
A $15,000 credit line has been extended to Advertiser. Commissions for actions generated the prior week (Monday thru Sunday) will be paid Wednesday of the following week via wire or check by fax. If at any time the balance is $15,000 or more, the balance must be paid in full the same day that said balance is $15,000 and should be paid via check by fax. Payment not made within five (5) days of the due date shall accrue interest at the rate of 1.5% per month; or if less, the highest rate permitted under law. In addition, Advertiser shall be liable to RRM for all attorneys' fees and other costs of collection to collect such unpaid amounts. In the event Advertiser owes RRM monies pursuant to this Agreement; or in the event Advertiser owes RRM monies pursuant to any other agreement between the parties and/or their affiliates; or in the event RRM owes Advertiser monies pursuant to any other agreement between the parties, then RRM may offset, charge back or credit any amounts due and owing under this Agreement or any other agreement against any amounts outstanding under this Agreement or such other agreements; provided that RRM notifies Advertiser and accounts, in writing, for any such offset, charge back or credit. Upon notice of termination or cancellation of this agreement or service, RRM will set-off any remaining pre-paid balance against any residual balance due and owing.

**Exclusivity**
Advertiser agrees that RRM shall have the first right of refusal to market ADVERTISER products online exclusively until the terms of this Insertion Order are expired. RRM shall have exclusive rights to market ADVERTISER products online. This right of exclusivity shall remain in effect and shall only expire 30 days after RRM acknowledges in writing receipt of a notification that Advertiser has requested an exclusivity cancellation. Should RRM lose this exclusive right, Advertiser will inform RRM 30 (Thirty) days prior to the start date of Advertiser looking for alternate means to market ADVERTISER products online. Should Advertiser look for alternate means to market ADVERTISER products online via CPA methods prior to this 30 (Thirty) day period, Advertiser agrees to pay a penalty to RRM. The penalty shall equal the total amount that would be paid if this Insertion Order were fulfilled. The Total Amount is acknowledged at $40,000.00.

**Payment Method**
Please pay by means of 'Check by Fax', then please fax payments to (714) 464-5425.
Please make checks payable to: 'Rapid Response Marketing' Or via Wire.

**Confidentiality and Non-Disclosure**
RRM and Advertiser mutually agree to hold confidential and proprietary all account information and trade secrets, ("confidential information"), in trust and confidence and agree that it shall be used only for the contemplated purposes, shall not be used for any other purpose, or disclosed to any third party, during the term of this contract and for a term of five (5) years after any termination of this contract. Confidential information includes, but is not limited to: the monetary value of RRM business with Advertiser, rates and

2 Of 7

Advertiser Initials: _____

RRM Initials: _____

fees, traffic volumes, the identity of RRM Advertisers/Publishers/Clients, business models, business practices, revenue sources, software code, software designs, hardware designs, and network architecture designs.

**Non-Solicitation with RRM Affiliates.** Advertiser will not participate in any performance based advertising relationship with any RRM Affiliate that markets the product hereunder, unless a previously existing business relationship between Advertiser and Affiliate can be demonstrated to the reasonable satisfaction (which is defined as a time prior to the effective date of this Insertion Order in which there was a monetary transaction between the Advertiser and the Affiliate). In this connection, both Parties agree and acknowledge that if Advertiser violates its obligations hereunder, RRM will be entitled to damages in the amount of thirty percent (30%) of the gross revenues resulting from sales conducted by Advertiser through the advertising or marketing efforts of Affiliate during the term of this Agreement, and for gross revenues in the three (3) months preceding the date such violation was discovered by RRM and the three (3) months after termination of this Agreement.

**Event of Downtime**
In the event that the site to which traffic is going fails or goes down for more than 20 minutes or the tracking pixel is taken off said site, placed improperly or malfunctioning on any given day, (down date), without prior notice to RRM, then Advertiser shall pay RRM the greater of either the Default CPA, (the average daily or average hourly conversion measurements plus 15%); or the actual CPA for such down dates.

**Delivery Measurement Standards**
Advertiser will provide RRM with unique tracking links. RRM will have access to live reporting of campaign statistics such as impressions, clicks, units, etc. via the Internet through Advertiser's Tracking Center. Additionally, Advertiser shall place pixels where it feels necessary on behalf of RRM in order to track the units generated from the campaign. Advertiser shall be responsible for the accuracy of the pixel placement and the results it yields. If Advertiser places said pixel incorrectly and the pixel fired multiple times per action, then Advertiser will be responsible for paying for each time it fires. Advertiser agrees that they will never remove the tracking pixels, change their location or alter them in anyway. RRM will also track campaign statistics through their own reporting system. Payment will be owed and calculated based on statistics from the Party that shows the greater quantity of units. In addition, Advertiser shall be responsible for filtering out ineligible leads/actions/sales, including but not limited to duplicates, scripting, automated submits of any kind, bad words, invalid phone numbers, or invalid addresses before the customer advances to the page in which the pixel is fired and will therefore be responsible for ensuring that pixels fire only on eligible units. Eligible units shall be considered billable units.

**Creative Guidelines**
Advertiser agrees to grant RRM a non-exclusive, transferable license to reproduce and display Advertiser trademarks, service marks and logos, (collectively referred to as "Trademarks"), solely for RRM performance hereunder. Such license will terminate automatically upon the date of expiration or termination of this Agreement. All creative material, information, advertising, etc. developed by Advertiser and supplied from time to time to RRM, (collectively referred to as the "Advertising"), for RRM's performance hereunder will be the sole property of Advertiser. Advertiser agrees that no alterations or editing of any content, (including but not limited to the rules and restrictions pertaining to fields in the form), on the website shall be changed without prior written approval from an RRM Officer. If RRM creates creatives, copy or any other material used for solicitation purposes, then it belongs to RRM. Advertiser shall have no rights to ownership of any such creative; nor shall they disburse, duplicate or distribute it to any affiliate, publisher, network or any other third party.

Advertiser will not attempt in any way to alter, modify, eliminate, conceal, or otherwise render inoperable or ineffective the RRM Site tags, source codes, links, pixels, modules or other data provided by or obtained from RRM that allows RRM to measure ad performance and provide its service. In addition, Advertiser acknowledges that all information, data and reports received from RRM as part of the Services are proprietary to and owned by RRM. If instructed to do so by RRM, Advertiser will immediately destroy and discontinue the use of any such reports or data, and any other material owned by RRM or the third party Advertisers.

**RRM's Warranties and Representations**
*EMAIL*
Affiliate understands that Advertiser has a policy of zero-tolerance with respect to deceptive or fraudulent use of any communication, including electronic transmissions. Affiliate understands and complies with all applicable laws and regulations relating to the performance of their obligations hereunder including but not limited to, the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003. Affiliate hereby certifies to the Advertiser that (a) Affiliate does not and has not engaged in any conduct prohibited by the Can-Spam Act, including without limitation e-mail harvesting, dictionary attacks or other deceptive practices; and (b) no e-mail sent by Affiliate violates any laws or regulations, including without limitation, the Can-Spam Act. Affiliate also agrees that they will follow Advertiser's suppression list guidelines and check their email database against the Advertiser's database before each mailing.

3 Of 7

Advertiser Initials: _____          RRM Initials: _____

Affiliate specifically hereby certifies that they will:

a) provide reliable mechanisms for email recipients to "opt-out" for future emails that is operational for at least thirty (30) days after sending the message and honor all opt-out requests within ten (10) business days of receipt of such requests;

b) not send any future emails to anyone who elects to opt-put, or who is identified by Advertiser as having opted out.

c) not provide misleading email headers and other practices that mask the origin of the emails;

d) identify each email as an advertisement or solicitation;

e) promptly inform Advertiser of any allegations or complaints regarding deceptive or fraudulent advertisements or solicitations;

f) cooperate with and assist Advertiser to investigate any allegations or complaints;

g) not add any content in the email that is considered to be adult, pornographic, obscene, or any other objectionable language and/or words;

h) not use any email formatting method to circumvent spam filtering systems. For example, Affiliate may not include text in an email, which is unrelated to the email or promotion, that is designed to help the email circumvent spam filtering systems. An example would be an email with text excerpts from major novels;

i) not initiate emails from IP addresses outside the United States. For example. Affiliate will not send Advertiser's marketing offers from a Russian IP;

j) Test Email prior to the launch of any new email campaign a test email must be reviewed and approved in writing by Advertiser, such approval not to be unreasonably withheld;

k) not use misleading subject lines;

l) include the sender's physical address and a phone number in which an opt-out request can be requested

RRM reserves the right, in its sole discretion and without liability, to reject, omit or exclude any Advertiser, campaign, creative materials, or Website for any reason at any time, with or without notice to the Advertiser and regardless of whether such Advertiser or Website was previously accepted.

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, RRM MAKES NO WARRANTIES AND EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, AS TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. RRM SHALL NOT BE LIABLE FOR ANY AD, CAMPAIGN OR E-MAIL, INCLUDING BUT NOT LIMITED TO THE CONTENT THEREOF, ANY UNAVAILABILITY OR INOPERABILITY OF THE INTERNET, UNAVAILABILITY OR CONSEQUENCES OF ANY AD OR CAMPAIGN, THE RRM SITE, OR SERVICES, OR ANY TECHNICAL MALFUNCTION, COMPUTER ERROR, CORRUPTION OR LOSS OF INFORMATION RELATED TO OR ARISING OUT OF THE SERVICES, THE RRM SITE OR ANY AD OR CAMPAIGN.

THE INFORMATION AND CONTENT ON THE RRM SITE AND VIA THE SERVICE IS PROVIDED ON AN "AS IS" BASIS WITH NO WARRANTY. IN NO EVENT SHALL RRM BE LIABLE FOR ANY LOST PROFITS, LOST REVENUES OR FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT, EVEN IF SUCH DAMAGES ARE FORSEEABLE AND WHETHER OR NOT THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL RRM'S LIABILITY HEREUNDER EXCEED THE PAYMENTS MADE BY ADVERTISER TO RRM IN THE 6 MONTHS PRECEDING THE EVENT GIVING RISE TO THE CLAIM.

UNLESS OTHERWISE STATED ON THE IO, RRM DOES NOT WARRANT OR GUARANTEE CONVERSION RATES, PAY-UP RATES, RESPONSE RATES, THE ABILITY TO CONVERT THE RESPONSES INTO SALES, THE ACTIVITIES OF ITS PUBLISHERS OR ANY BENEFIT ADVERTISER MAY RECEIVE BY ADVERTISING WITH RRM OR ITS PUBLISHERS. RRM DOES NOT WARRANT OR GUARANTEE THE PROFILE OR DEMOGRAPHICS OF A USER. RRM DOES NOT GUARANTEE TO MATCH COLORS, TEXT, PHOTO IMAGE OR SCREEN DESIGN. ALL ORDERS ARE CONTINGENT UPON RRM'S ABILITY TO PROCURE NECESSARY ON-LINE ACCESS AND UPON DELAYS CAUSED BY ACCIDENTS, WAR, ACT OF GOD, EMBARGOES, OR ANY OTHER CIRCUMSTANCES BEYOND RRM'S CONTROL. RRM WILL MAKE COMMERCIALLY REASONABLE EFFORTS TO MEET SCHEDULED DELIVERY AND ONLINE DATES, BUT MAKES NO GUARANTEE AND ACCEPTS NO LIABILITY FOR ITS FAILURE TO MEET SAID DATES.

## Advertiser Warranties and Representations

*User Complaints, Required Actions.* Should Advertiser receive complaints from Users or Customers, Advertiser shall immediately notify RRM and provide full details of the basis of the complaints and, if applicable, copies of all related documentation. In the event that the User or Merchant complaint relates to an email-based Advertisement or to invalid click-throughs, then Advertiser shall provide such email-based Advertisement to RRM along with its full email header information; and, in the case of invalid click-throughs, Advertiser shall provide full scripting and scrub documentation evidencing all invalid click-throughs. Upon receipt of the foregoing documentation, RRM agrees to contact the appropriate Publisher to request the removal of the User from a Publisher's

4 Of 7

Advertiser Initials: _____

RRM Initials: _____

email-based publications. RRM shall also request, and provide to Advertiser if available, information from the Publisher relating to such User. Advertiser agrees that the foregoing Section shall be Advertiser's sole remedy with regard to User or Customer complaints.

Advertiser is solely responsible for any liability arising out of or relating to any Ad provided by Advertiser hereunder and any material to which users can link through such Ad ("Linked Content"). Advertiser represents and warrants that no part of the Ads or Linked Content will: (a) infringe on any third party's copyright, patent, trademark, trade secret or other proprietary rights or right of publicity or privacy; (b) violate any law, statute, ordinance or regulation, including, without limitation, laws and regulations governing export control, false advertising, Children's Online Privacy Protection Act, the Can-Spam Act, the Federal Trade Commission Act and the Digital Millennium Copyright Act or unfair competition; (c) be defamatory or libelous; (d) be pornographic or obscene; or (e) contain viruses, trojan horses, worms, time bombs, cancelbots or other similar harmful or deleterious programming routines.

Advertiser represents and warrants that the product or service that is being promoted through any Campaign hereunder is not the subject of any ongoing investigation by any local, state or federal regulatory or quasi-regulatory authorities and that the advertised goods and services offers legitimate goods and services that comply with all law, statutes or other governmental or administrative rules or regulations and that all product and service is fulfilled and customers are provided with satisfactory customer service.

Advertiser further represents and warrants that: (a) it will legally collect and use email addresses for a Suppression List in accordance with the law where applicable; (b) it shall maintain its website and/or servers in working condition at or above industry standards; (c) it has full right and power to enter into and perform this Agreement without the consent of any third party; and (d) will not make any modification whatsoever to any of the Program Materials or website without obtaining prior written approval from an Officer of the Publisher.

Advertiser warrants that all compensation for offers made available to RRM are equal to or greater than any compensation given to another publisher or network. Should this condition be violated, Advertiser will compensate RRM for the difference in price per lead plus ten percent (10%) since inception of the signed IO.

**Applicable Law**
This Agreement shall be governed and construed in accordance with the laws of the State of Nevada, without regard to conflicts of law principles, and shall benefit and be binding upon the parties hereto and their respective successors and assigns. Any action relation to this Agreement shall be brought exclusively in a federal or state court sitting in the City of Las Vegas, Nevada, and the Parties hereby submit to the personal jurisdiction of such courts.

**No Waiver**
The failure of any Party to enforce, at any time, the provisions of this Agreement, or to insist upon the strict performance of any covenant or condition of this Agreement, or to exercise any option which is hereby provided, shall in no way be construed to be a waiver of such provision; nor in any way affect the validity of this Agreement or any part thereof, or the right of such Party thereafter to enforce each and every provision of this Agreement.

**LIMITATION OF LIABILITIES:**
EXCEPT FOR INDEMNIFICATION OBLIGATIONS, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY KIND OR NATURE WHATSOEVER (INCLUDING LOST PROFITS OR REVENUES, OR HARM TO BUSINESS) EVEN IF SUCH PARTY HAS BEEN NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL RRM's LIABILITY UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHER LEGAL THEORY, BE GREATER THAN THE TOTAL AMOUNT PAID BY ADVERTISER TO RRM HEREUNDER.

**Indemnification/Hold Harmless:**
Advertiser agrees to indemnify and hold harmless RRM its subsidiaries, parent companies and their respective representatives, directors, officers, agents, and employees for any damages, losses, costs, and expenses, including without limitation reasonable attorney's fees arising from any liability related to any act or omission of the Advertiser hereunder, unless due to the sole act or omission of RRM. RRM agrees to indemnify and hold harmless Advertiser, its subsidiaries, parent companies and their respective representatives, directors, officers, agents, and employees for any damages, losses, costs, and expenses, including without limitation reasonable attorney's fees arising from any liability related to any act of omission of RRM hereunder, unless due to the sole act or omission of Advertiser.

Advertiser Initials: _____          5 Of 7          RRM Initials: _____

**Non-Assignment**

Advertiser may not assign this Agreement without the prior written consent of RRM, which shall not be unreasonably withheld. RRM may not assign this Agreement without the prior written consent of Advertiser, which shall not be unreasonably withheld.

**Construction**

Each party acknowledges that the provisions of this Agreement were negotiated to reflect an informed, voluntary allocation between them of all the risks (both known and unknown) associated with the transactions contemplated hereunder. Further, all provisions are inserted conditionally on their being valid in law. In the event that any provision of the Agreement conflicts with the law under which the Agreement is to be construed or if any such provision is held invalid or unenforceable by a court with jurisdiction over the Parties to the Agreement: (i) such provision will be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law; and (ii) the remaining terms, provisions, covenants, and restrictions of the Agreement will remain in full force and effect.

**Relationship of the Parties**

The Parties to the Agreement are independent contractors. Neither party is an agent, representative, partner or employee of the other party. Neither party will have any right, power, or authority to enter into any agreement on behalf of, or incur any obligation or liability of, or to otherwise bind the other party. The Agreement will not be interpreted or construed to create an association, agency, joint venture, or partnership between the Parties or to impose any liability attributable to such a relationship upon either party.

**Invalidity**

The invalidity or unenforceability of any one or more of the particular provisions of this Agreement shall not affect the enforceability of the other provisions hereof, all of which are inserted conditionally on their being valid in law, and in the event one or more provisions contained herein shall be invalid, this Agreement shall be construed as if such invalid provision had not been inserted.

**Headings and References**

Headings of Sections are for the convenience of reference only. Words indicated in quotes and capitalized signify an abbreviation or defined term for indicated words or terms, including those definitions contained in the opening paragraph. The content in any applicable IO is incorporated by this reference as though fully stated in this Agreement.

**Entire Agreement**

This IO combined with the Agreement embodies our entire agreement, supersedes all prior oral and written agreements, and may not be amended unless in writing and accepted by both parties. This Agreement may be executed in any number of parts and facsimile copies, each of which shall be deemed the original, and all of which together shall be deemed one and the same instrument. In the event that any of the provisions included herein or the application thereof shall be held by a court of law to be invalid, illegal, or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

**SIGNATURES**

AUTHORIZED ADVERTISER REPRESENTATIVE

Signature: _____

Date: _____26 June 2008_____

AUTHORIZED RAPID RESPONSE MARKETING REPRESENTATIVE

Signature: _____

Date: _____

**TERMS AND AGREEMENT:**

"By signing above, each party hereby agrees to the terms set forth on the Master Advertiser Agreement. Each Party warrants a) that it has full power and authority to enter into this Agreement and b) that the execution, delivery and performance by each Party of this Agreement will not violate any law, statute or other governmental regulations. Both Parties covenant that the signing of this

6 Of 7

Advertiser Initials: _____                                RRM Initials: _____